

# BMO Harris Bank

# EQUITY LINE CREDIT AGREEMENT AND DISCLOSURE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $45,000.00 | 08-15-2012 | 08-20-2022 | ▮▮▮▮ | O1C1 | | U3R | |

References in the boxes above are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  GERALD J SAWEIKIS
EILEEN T SAWEIKIS
8440 W 122ND PL
Palos Park, IL  60464

**Lender:**  BMO HARRIS BANK N.A.
111 W. MONROE STREET
P.O. BOX 755
CHICAGO, IL  60690

**CREDIT LIMIT: $45,000.00**                    **DATE OF AGREEMENT: August 15, 2012**

**Introduction.** This Equity Line Agreement and Disclosure ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through BMO HARRIS BANK N.A.. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean BMO HARRIS BANK N.A.. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay BMO HARRIS BANK N.A., or order, the total of all credit advances and **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. **If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.**

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until August 20, 2022 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of Illinois, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: 120 months from the Loan Date of the Credit Agreement. You may obtain credit advances during this period ("Draw Period"). You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** Your "Regular Payment" will equal the amount of your accrued **FINANCE CHARGES**. You will make 119 of these payments. You will then be required to pay the entire balance owing in a single balloon payment. If you make only the minimum payments, you may not repay any of the principal balance by the end of this payment stream. Your payments will be due monthly. Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges. An increase in the **ANNUAL PERCENTAGE RATE** may increase the amount of your Regular Payment. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**Balloon Payment.** Your Credit Line Account is payable in full upon maturity in a single balloon payment. You must pay the entire outstanding principal, interest and any other charges then due. **Unless otherwise required by applicable law, we are under no obligation to refinance the balloon payment at that time. You may be required to make payments out of other assets you own or find a lender, which may be us, willing to lend you the money. If you refinance the balloon payment, you may have to pay some or all of the closing costs normally associated with a new credit line account, even if you obtain refinancing from us.**

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to any amounts that exceed your Credit Limit; then to Finance Charges; then to any voluntary credit life and disability insurance premiums; then to unpaid principal; and then to late charges and other charges.

**Receipt of Payments.** All payments must be made in U.S. dollars and must be received by us consistent with any payment instructions provided on or with your periodic billing statement. If a payment is made consistent with our payment instructions but received after 3:00 PM Central Standard Time on a business day, we will apply your payment to your Credit Line on the next business day.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Forty-five Thousand & 00/100 Dollars ($45,000.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Line. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Loan Activator Check" that we will supply to you.

**Telephone Request.** Requesting a credit advance from your Credit Line to be applied to your designated account by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, **you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable**

for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.

**Requests By Mail.** Requesting an advance by mail.

**Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

**Credit Card Access.** Using your "Harris Equity Access Card" to receive cash advances or to make purchases.

**ATM Access.** Using your "Harris Equity Access Card/ATM Card" at any of our designated ATM locations.

**Cash Advance.** Using your Harris Equity Access Card to obtain cash advances from financial institutions that display the Mastercard logo.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Loan Activator Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Loan Activator Check.

**Post-dated Checks.** Your Loan Activator Check is post-dated. If a post-dated Loan Activator Check is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your Loan Activator Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Loan Activator Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Loan Activator Check.

**Transaction Violation.** Your Loan Activator Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Loan Activator Check.

If we pay any Loan Activator Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Loan Activator Check. The Loan Activator Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Loan Activator Checks along with your periodic billing statements; however, your use of each Loan Activator Check will be reflected on your periodic statement as a credit advance. We do not "certify" Loan Activator Checks drawn on your Credit Line.

**Limitations on the Use of Credit Cards.** We reserve the right not to honor Harris Equity Access Cards in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Harris Equity Access Card charge.

**Stolen Credit Cards.** Your Harris Equity Access Cards have been reported lost or stolen.

**Unauthorized Signatures.** Your Harris Equity Access Card is not used by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Credit Line charge.

**Transaction Violation.** Your Harris Equity Access Card charge is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Credit Line charge.

If we pay any advance requested by use of the Harris Equity Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Harris Equity Access Card will be reflected on your periodic statement as a credit advance.

**Limitations on the Use of ATM Cards.** We reserve the right not to honor Harris Equity Access Card/ATM Cards in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by honoring the Harris Equity Access Card/ATM Card charge.

**Stolen ATM Cards.** Your Harris Equity Access Card/ATM Cards have been reported lost or stolen.

**Unauthorized Signatures.** Your Harris Equity Access Card/ATM Card is not used by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we honored the Credit Line charge.

If we pay any advance requested by use of the Harris Equity Access Card/ATM Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Harris Equity Access Card/ATM Card will be reflected on your periodic statement as a credit advance.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line Loan Activator Check, Telephone Request, Request By Mail and In Person Request Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Loan Activator Checks, requesting an advance by telephone, requesting an advance by mail and requesting an advance in person.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $500.00. This means any Loan Activator Check must be written for at least the minimum advance amount.

**Credit Card Limitations.** The following transaction limitations will apply to your Credit Line and using a Credit Card.

**Maximum Number of Advances Per Period.** The maximum number of advances that you may obtain per day is 50.

**Maximum Amount Per Period.** The maximum dollar amount of advances that you may obtain per day is $10,000.00.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $500.00.

**ATM Access Limitations.** The following transaction limitations will apply to your Credit Line and using an Automated Transaction Machine ("ATM") access card.

**Maximum Number of Advances Per Period.** The maximum number of advances that you may obtain per day is 15.

**Maximum Amount Per Period.** The maximum dollar amount of advances that you may obtain per day is $1,000.00.

· **Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $500.00.

**Other Transaction Requirements.** For cash advances at ATMs and participating financial institutions.

**Cash Advance Limitations.** The following transaction limitations will apply to your Credit Line and accessing by other methods.

**Maximum Number of Advances Per Period.** The maximum number of advances that you may obtain per day is 3.

**Maximum Amount Per Period.** The maximum dollar amount of advances that you may obtain per day is $1,000.00.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $500.00.

**Limitation on All Access Devices.** You may not use any access device, whether described above or added in the future, for any illegal or unlawful transaction, and we may decline to authorize any transaction that we believe poses an undue risk of illegality or unlawfulness. Notwithstanding the foregoing, we may collect on any debt arising out of any illegal or unlawful transaction.

**Authorized Signers.** The words "Authorized Signer" on Loan Activator Checks, Harris Equity Access Cards and Harris Equity Access Card/ATM Cards as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Loan Activator Checks, Harris Equity Access Cards and Harris Equity Access Card/ATM Cards.** If you lose your Loan Activator Checks, Harris Equity Access Cards or Harris Equity Access Card/ATM Cards or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (888) 340-2265. You also can notify us at Harris Consumer Lending Center 3800 Golf Road Suite 300 P.O. Box 5043, Rolling Meadows, IL 60008.

**Unauthorized Use.** "Unauthorized Use" means the use of your Harris Equity Access Card by a person, other than you, who does not have actual, implied, or apparent authority for such use, and for which you receive no benefit.

**Liability For Unauthorized Use.** You may be liable for the unauthorized use of your Harris Equity Access Card access device which accesses your Credit Line. You will not be liable for unauthorized use that occurs after you notify us or our designee at Harris Card Services P.O. Box 94019, Palatine, IL 60094-4019, orally or in writing, of the loss, theft, or possible unauthorized use. In any case, your liability for unauthorized use of your Harris Equity Access Card will not exceed $50.00.

If you use an access card which debits a checking account (or other consumer asset account) but also draws on an overdraft line of credit, Regulation E provisions apply, as well as sections 226.13(d) and (g) of Regulation Z. In such a transaction, you might be liable for up to $50.00 under Regulation Z. Also, you might be liable for $50.00, $500.00, or an unlimited amount under Regulation E, or a lesser amount under applicable state law. Please refer to your electronic fund transfers disclosure for liability limitations and error-resolution procedures for transactions covered by the federal Electronic Fund Transfers Act.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage dated August 15, 2012, to us on real property located in Cook County, State of Illinois.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement, unless prohibited by applicable law. It will show, among other things, credit advances, **FINANCE CHARGES**, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a **FINANCE CHARGE** on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances, and subtract any unpaid **FINANCE CHARGES** and any payments or credits. This gives us the "daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any FINANCE CHARGE is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic **FINANCE CHARGES** for each day in the billing cycle. This is your **FINANCE CHARGE** calculated by applying a Periodic Rate.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** as follows. We start with an independent index which is the highest Prime Rate as published in the "Money Rates" section of The Wall Street Journal on the first business day of the month (the "Index"). We will use the most recent Index value available to us as of the first business day of the calendar month in which the monthly billing period begins, adjusted by any applicable margin or discount as the basis of any **ANNUAL PERCENTAGE RATE** adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your account, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE**. The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

The Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in

the Index will take effect monthly. The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE for each billing cycle shall be set at the beginning of each billing cycle and remain constant during that billing cycle. In no event will the Periodic Rate result in a corresponding ANNUAL PERCENTAGE RATE that is less than 3.990% or more than 18.000%, nor will the Periodic Rate or corresponding ANNUAL PERCENTAGE RATE exceed the maximum rate allowed by applicable law. Today the Index is 3.250% per annum, and therefore the Initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line are as stated below:

**Current Rates for the First Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 1.950% | 5.200% | 0.01425% |

**Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds.**

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**Annual Fee.** A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: at the beginning of the second year after the Credit Line Account is opened.

**Late Charge.** Your payment will be late if it is not received by us within **10 days after the "Payment Due Date" shown on your periodic statement.** If your payment is late we may charge you 5.000% of the payment or $20.00, whichever is greater.

**Other Charges.** Your Credit Line Account may be charged the following other charges: Harris Equity Access Card Replacement Fee. The amount of this other charge is: $5.00.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien; or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our attorneys' fees and our legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Rate Increase.** In addition to our other rights during termination and acceleration, we may increase the variable **ANNUAL PERCENTAGE RATE** under this Agreement to 18.000 percent. The **ANNUAL PERCENTAGE RATE** will not exceed the maximum rate permitted by applicable law. If we do not increase the **ANNUAL PERCENTAGE RATE** upon termination or acceleration of your Credit Line Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your Credit Line Account.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Loan Activator Checks and any other access devices. Any use of Loan Activator Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Loan Activator Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.



# EQUITY LINE CREDIT AGREEMENT AND DISCLOSURE

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address and return all Loan Activator Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued **FINANCE CHARGES**, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Harris Consumer Lending Center, 3800 Golf Road Suite 300, P.O. Box 5043 Rolling Meadows, IL 60008.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Annual Review.** You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms provided by us. Based upon this information we will conduct an annual review of your Credit Line Account. You also agree we may obtain credit reports on you at any time, at our sole option, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option. You agree to reimburse us for any costs we incur in connection with the annual review. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Harris Consumer Lending Center 3800 Golf Road Suite 300 P.O. Box 5043 Rolling Meadows, IL 60008.

**Jury Waiver. We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.**

**Credit Line Account Fee Schedule.** You agree to pay the following fees: A RETURNED PAYMENT FEE of $25.00 each time a payment is returned unpaid for any reason. The returned payment fee may be charged even if the item is paid upon presentment. A STOP PAYMENT FEE of $30.00 each time you request us not to pay a Loan Activator Check issued by you to access the Credit Line Account. A RESEARCH FEE of $40.00 per hour ($15.00 minimum fee) each time you request research information regarding your Credit Line Account. A LOAN ACTIVATOR CHECK COPY FEE of $5.00 for each copy of a Loan Activator Check request in excess of three (3) Checks per statement period. A DUPLICATE STATEMENT FEE of $5.00 for each duplicate statement you request. A PAYOFF LETTER PREPARATION FEE of $25.00. A RETURNED LOAN ACTIVATOR CHECK FEE of $32.00 will be assessed each time you issue a Loan Activator Check in an amount greater than the available credit under the Credit Line Account and the Loan Activator Check is returned by us.

**CREDIT LINE PURPOSE.** Notwithstanding the language in the paragraph headed "Term" above, if the first advance made under the Credit Line is used to help finance the purchase of the collateral, you acknowledge that the right to cancel is not applicable to this advance. Furthermore, you agree that no additional advances will be requested by you until after the expiration of the three-day cancellation period.

**CONVERSION OPTION.** This option provides the opportunity to convert all or a portion of the outstanding revolving balances on your Account from a variable rate of interest to a fixed rate of interest repayable in equal monthly installments of principal and interest based on an amortization and payment schedule (a "Rate Lock Feature"). You may exercise this option only during the draw period (the first ten years of the Credit Agreement) provided that your Credit Line Account is not in default. More than one (but not more than three) Rate Lock Features may be outstanding at any time. The minimum amount to be converted to a Rate Lock Feature at any time is $5,000.00. The Credit Line available for credit advances will be restored by the amount of any principal on Rate Lock Features that is repaid. Revolving credit advances plus the principal amount of all Rate Lock Features may not exceed your Credit Limit. A Rate Lock Feature may be prepaid in whole or in part at any time without penalty.

You may request information from us with respect to the fixed interest rate and amortization and payment options being offered. The **ANNUAL PERCENTAGE RATE** applicable to a Rate Lock Feature if you exercise this option may be greater than the rate applicable to the Credit Line. The **ANNUAL PERCENTAGE RATE** for each Rate Lock Feature will be a fixed rate equal to 18% (Daily Periodic Rate of 0.04932%). We may at our sole discretion provide a Rate Lock Feature at a discounted **ANNUAL PERCENTAGE RATE** that is lower than the rate stated above. The **ANNUAL PERCENTAGE RATE** for each Rate Lock Feature will be disclosed on page 1 of the corresponding Conversion Confirmation Letter for that Rate Lock Feature. If we provide a discounted **ANNUAL PERCENTAGE RATE** for one Rate Lock Feature, we are not obligated to offer a discounted **ANNUAL PERCENTAGE RATE** on any subsequent Rate Lock Feature. **[Finance charges for a billing cycle for this feature will be based on the total of each day's Daily Periodic rate multiplied by the Daily Balance.]**

The term of any Rate Lock Feature ("Rate Lock Term") shall not exceed the lesser of one hundred twenty (120) months or the Maturity Date of Credit Agreement.

To exercise a Rate Lock Feature, you will receive, sign and return to the Harris not later than the date specified in the Conversion Confirmation Letter, the necessary documentation that will provide you with the interest rate, maturity and payment schedule for the Rate Lock Feature. All Rate Lock Features are payable in full by the earlier of the following: expiration of the Rate Lock Term or Maturity Date of the Credit Agreement. The monthly payment on any Rate Lock Feature will be the amount of principal and interest sufficient to repay the Rate Lock Feature over the amortization schedule selected. This monthly amount will be added together with the monthly amount of principal and interest for all other Rate Lock Features and the Regular Payment on other credit advances on the Credit Line to determine the Minimum Payment due on your Credit Line Account each month. There may be a balloon payment on the earlier of the expiration of the Rate Lock Term or Maturity Date of the Credit Agreement. All Rate Lock Features remain as credit advances under the Credit Line, to be repaid at a fixed rate of interest, and are

secured by and are subject to the security interest granted by you to us in the property described in the Mortgage given as collateral to secure the Credit Line Account. Signing and returning the necessary documentation not later than the date specified in the Conversion Confirmation Letter, or agreement of the Borrower (or by any Borrower if more than one) constitutes a request for conversion of the stated amount of outstanding balances to a Rate Lock Feature and the Borrower(s)' promise to repay the amount of such Rate Lock Feature together with **FINANCE CHARGES** thereon at the stated fixed interest rate on the unpaid balance of the Rate Lock Feature in equal monthly installments according to the payment schedule and in accordance with the terms and conditions of this Agreement. There is a fifty dollar ($50) fee **FINANCE CHARGE** to exercise each option to convert outstanding balances to a Rate Lock Feature. You agree to sign and return the required documentation to exercise this option not later than the date specified in the Conversion Confirmation Letter. By signing the Conversion Confirmation Letter, you choose to exercise this option and agree to the effective date of the conversion. The effective date of the conversion and the date we will apply the fixed rate to your converted balance will be the first calendar day of the billing cycle after we receive the signed documentation necessary to process the conversion.

The exercise of this conversion option is not available to Borrower(s) in default under the Agreement. You will receive one periodic statement for your entire Credit Line Account including all outstanding Rate Lock Features.

During the time any Rate Lock Feature is outstanding your payments will be applied to the entire Credit Line Account as follows: (1) interest on revolving credit advances; (2) interest and principal payments due on Rate Lock Features (and if more than one Rate Lock Feature is outstanding, payments will be applied from the oldest Rate Lock Feature outstanding to the most recent Rate Lock Feature outstanding); (3) fees on the Credit Line Account; (4) principal on revolving credit advances and (5) principal on Rate Lock Features (from the oldest Rate Lock Feature to the most recent Rate Lock Feature).

**HARRIS EQUITY ACCESS CARD.** Notwithstanding anything contained in this Agreement to the contrary, access to your Credit Line Account using the Harris Equity Access Card may not be available in your state. If access pursuant to the Harris Equity Access Card is not available in your state but later becomes available, we will so advise you and will issue a Harris Equity Access Card to you upon your request provided that you qualify for card issuance. You understand and agree that the Harris Equity Access Card is **NOT** a debit card and only one Harris Equity Access Card will be issued to each Borrower who elects card access. The words "credit card" or "Harris Equity Access Card" or "Harris Equity Access Card/ATM Card" as used in this Agreement means the MasterCard that may be issued to you as an access devise to your Credit Line Account. The words "our designated ATM locations" mean any ATM displaying the MasterCard logo. MasterCard is a registered service mark of MasterCard International Incorporated.

**ADDITIONAL AGREEMENTS.** You agree that we are not responsible for the refusal of any financial institution to honor the Harris Equity Access Card, even if that financial institution displays the MasterCard logo. You agree that we are not responsible for the refusal of any merchant to accept the Harris Equity Access Card, even if that merchant accepts MasterCard in payment for goods and services. Notwithstanding anything contained in this Agreement to the contrary, you agree that you are responsible for all purchases, advances, **FINANCE CHARGES**, and other charges and fees arising from the use of the Harris Equity Access Card (including the Harris Equity Access Card/ATM Card) by yourself or any other person you permit to use the Harris Equity Access Card, even if that person exceeds the scope of your permission to use your Harris Equity Access Card. Borrower agrees that the term "Credit Agreement" as used herein means this Agreement. This Agreement includes any extensions, renewals, modifications, substitutions, or amendments to this Agreement. **Notwithstanding anything to the contrary in this Agreement, you agree that the Harris Equity Access Card cannot currently be used to debit a checking account (or other consumer asset account) or draw upon an overdraft line of credit. By signing this Agreement, you agree that the paragraph above beginning "If you use an access card that debits a checking account . . ." does not apply to your Harris Equity Access Card because it cannot currently be used to debit a checking account (or other consumer asset account) or draw on an overdraft line of credit. If the ability to debit such accounts becomes available, we will so advise you.**

**CARD ACCESS/SETOFFS.** You acknowledge that this Agreement grants setoff rights to us. However, if you have received a Harris Equity Access Card and for such period of time as it is in full force and effect and has not been cancelled, terminated, or not renewed, we will no longer have setoff rights. But, if your Harris Equity Access Card is cancelled, terminated, or not renewed, our setoff rights will be restored and shall be the same as if a Harris Equity Access Card had never been issued to you.

**BORROWER ACTION.** If there is more than one Borrower, you agree that any Borrower is authorized to modify the terms of the terms of the this Agreement, any amendment thereto, or any other home equity line of credit document and that all such modifications shall apply to all Borrowers hereunder, provided that we agree in writing to any such modification. In addition, except as otherwise set forth herein, if there is more than one Borrower, each Borrower authorizes any other Borrower on his or her signature alone to request and receive advances, and to do all things necessary to carry out the terms of this Agreement as the same may be amended or modified from time to time. You agree that the actions of any one Borrower are binding upon all Borrowers hereunder and that you may follow the instructions of any one Borrower hereunder even if there is more than one Borrower.

**CANCELLATION OF CARD ACCESS. In consideration of us issuing you a Harris Equity Access Card, you acknowledge and agree that if we so elect we may cancel or terminate your Harris Equity Access Card and all access and credit privileges permitted thereby upon the occurrence of any of the following events: (1) you acknowledge and agree that we are not obligated to renew and to reissue to you a new Harris Equity Access Card after any expiration date of your Harris Equity Access Card; (2) you have not obtained an advance using your Harris Equity Access Card for 180 consecutive days; or (3) you request that we cancel your Harris Equity Access Card. If we cancel or terminate your Harris Equity Access Card, we will notify you of such cancellation or termination.**

**CANCELLATION; DAILY LIMITS.** You may call us and verbally cancel your card access privileges or reduce your Harris Equity Access Card daily dollar amount limits. If you do so, we will confirm your request in writing and our confirmation will be sent to your address on file with us. Our written confirmation will serve as an amendment to this Agreement. You must send any other requested changes to us in writing.

**MASTERCARD REFERENCES.** You acknowledge and agree that all references to MasterCard in this Agreement apply only to the extent and for so long as we use MasterCard as our card access service provider.

**CARD ISSUANCE.** You acknowledge and agree that we reserve the right in our sole discretion not to issue you a Harris Equity Access Card if you have ever been delinquent for 30 days or more on this Line of Credit account or on any other account of any type or kind with us.

**Early Cancellation Fee.** You will pay us an Early Cancellation Fee of $350.00 if you cancel the Credit Line Account within 36 months of the Date of Agreement.

**MORTGAGE LICENSING INFORMATION.** Mortgage Loan Origination Company Identifier: ▮▮▮▮▮▮
Mortgage Loan Originator Unique Identifier: ▮▮▮▮▮

**FOREIGN TRANSACTIONS.** Harris will charge, and Borrower will pay, in U.S. dollars for all foreign transactions at the exchange rate in effect at the time the transaction is entered to Borrower's Harris Credit Line Account, including any special currency exchange charges.

**Governing Law. This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of Illinois.**

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

**BORROWER:**

X _____
GERALD J SAWEIKIS

X _____
EILEEN T SAWEIKIS

**Effective Disbursement Date:** _____

# BILLING ERROR RIGHTS

## YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

> Harris Consumer Lending Center
> Attn: Billing Dept. / Servicing Dept. D
> 3800 Golf Road  P.O. Box 5043
> Rolling Meadows, IL  60008

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

> Your name and account number.

> The dollar amount of the suspected error.

> Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

### Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

> (a) You must have made the purchase in your home state or, if not within your home state within 100 miles of your current mailing address; and

> (b) The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement of the property or services.

LASER PRO Lending, Ver. 5.58.20.001 Copr. Harland Financial Solutions, Inc. 1997, 2012. All Rights Reserved. - IL  P:\Harland\santa1\CFI\LPL\D25.FC  TR-4539127  PR-25

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



## CTIC-HE

**Report Mortgage Fraud**
**800-532-8785**

Doc#: 1225146069 Fee: $66.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 09/07/2012 12:38 PM Pg: 1 of 15

---

The property identified as: **PIN:** ▉▉▉▉▉▉▉▉

**Address:**
**Street:** 8440 W 122ND PL
**Street line 2:**
**City:** PALOS PARK     **State:** IL     **ZIP Code:** 60464

**Lender:** BMO HARRIS BANK NA

**Borrower:** EILEEN T SAWEIKIS, not personally but as Trustee on behalf of THE EILEEN T SAWEIKIS DECLARATION OF TRUST DATED 04/04/1993 AND AMENDED 04/30/1999

**Loan / Mortgage Amount:** $45,000.00

This property is located within the program area and the transaction is exempt from the requirements of 765 ILCS 77/70 et seq. because the application was taken by an exempt entity.

**Certificate number:** ▉▉▉▉▉▉▉▉     **Execution date:** 08/15/2012



RECORDATION REQUESTED BY:
   BMO HARRIS BANK N.A.
   111 W. MONROE STREET
   P.O. BOX 755
   CHICAGO, IL 60690

WHEN RECORDED MAIL TO:
   Harris Consumer Lending
   Center
   3800 Golf Road Suite 300
   P.O. Box 5041
   Rolling Meadows, IL 60008

**FOR RECORDER'S USE ONLY**

This Mortgage prepared by:
   NANCY GLEASON
   Harris Consumer Lending Center
   3800 Golf Road Suite 300  P.O. Box 5003
   Rolling Meadows, IL 60008

## MORTGAGE

**MAXIMUM LIEN.** At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $45,000.00.

THIS MORTGAGE dated August 15, 2012, is made and executed between EILEEN T SAWEIKIS, not personally but as Trustee on behalf of THE EILEEN T SAWEIKIS DECLARATION OF TRUST DATED 04/04/1993 AND AMENDED 04/30/1999 (referred to below as "Grantor") and BMO HARRIS BANK N.A., whose address is 111 W. MONROE STREET, P.O. BOX 755, CHICAGO, IL 60690 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, **Grantor** mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Cook County, State of Illinois:**

> LOTS 1 AND 2 IN SPEHN'S RESUBDIVISION OF PART OF LOT 5 IN E.W. LAGER'S SUBDIVISION AND PART OF LOT 4 IN JOSEPH A. VARON'S SECOND ADDITION TO PALOS DELLS, A SUBDIVISION IN THE EAST 1/2 OF THE NORTHWEST 1/4 OF SECTION 26, TOWNSHIP 37 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT THEREOF RECORDED OCTOBER 28, 1993 AS DOCUMENT 93872808.

The Real Property or its address is commonly known as 8440 W 122ND PL, Palos Park, IL 60464. The Real Property tax identification number is ███████████████████████████

**REVOLVING LINE OF CREDIT.** This Mortgage secures the Indebtedness including, without limitation, a revolving line of credit and shall secure not only the amount which Lender has presently advanced to Borrower

under the Credit Agreement, but also any future amounts which Lender may advance to Borrower under the Credit Agreement within twenty (20) years from the date of this Mortgage to the same extent as if such future advance were made as of the date of the execution of this Mortgage. The revolving line of credit obligates Lender to make advances to Borrower so long as Borrower complies with all the terms of the Credit Agreement and Related Documents. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS INTENDED TO AND SHALL BE VALID AND HAVE PRIORITY OVER ALL SUBSEQUENT LIENS AND ENCUMBRANCES, INCLUDING STATUTORY LIENS, EXCEPTING SOLELY TAXES AND ASSESSMENTS LEVIED ON THE REAL PROPERTY, TO THE EXTENT OF THE MAXIMUM AMOUNT SECURED HEREBY. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under,

about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or

any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage and those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $5,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area. Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the maximum amount of Borrower's credit line and the full unpaid principal balance of any prior liens on the property securing the

loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $1,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such

proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to the lien securing payment of an existing obligation. The existing obligation has a current principal balance of approximately $465,000.00. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this

Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, terminates the credit line account, and Grantor otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Borrower, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit

the amount of that payment (A) to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Borrower), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Borrower's or Grantor's income, assets, liabilities, or any other aspects of Borrower's or Grantor's financial condition. (B) Borrower does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Borrower would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Illinois.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means GERALD J SAWEIKIS and EILEEN T SAWEIKIS and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated August 15, 2012, with credit limit of $45,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Credit Agreement is a variable interest rate based upon an index. The index currently is 3.250% per annum. If the index increases, the payments tied to the index, and therefore the total amount secured hereunder, will increase. Any variable interest rate tied to the index shall be calculated as of, and shall begin on, the commencement date indicated for the applicable payment stream. NOTICE: Under no circumstances shall the interest rate on this Mortgage be less than 3.990% per annum or more than the lesser of 18.000% per annum or the maximum rate allowed by applicable law. The maturity date of the Credit Agreement is August 20, 2022. **NOTICE TO GRANTOR:   THE CREDIT**

AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means THE EILEEN T SAWEIKIS DECLARATION OF TRUST DATED 04/04/1993 AND AMENDED 04/30/1999.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means BMO HARRIS BANK N.A., its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.**

**GRANTOR:**

**THE EILEEN T SAWEIKIS DECLARATION OF TRUST DATED 04/04/1993 AND AMENDED 04/30/1999**

By: _____

    EILEEN T SAWEIKIS, Trustee of THE EILEEN T SAWEIKIS DECLARATION OF TRUST DATED 04/04/1993 AND AMENDED 04/30/1999

---

## WAIVER OF HOMESTEAD EXEMPTION

I am signing this Waiver of Homestead Exemption for the purpose of expressly releasing and waiving all rights and benefits of the homestead exemption laws of the State of Illinois as to all debts secured by this Mortgage. I understand that I have no liability for any of the affirmative covenants in this Mortgage.

X _____
    GERALD J SAWEIKIS, Individually

X _____
    EILEEN T SAWEIKIS, Individually

## TRUST ACKNOWLEDGMENT

STATE OF ___ILLINOIS___ )
) SS
COUNTY OF ___COOK___ )

THERESA HUNT
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
March 28, 2016

On this ___15th___ day of ___August___ ___2012___ before me, the undersigned Notary Public, personally appeared **EILEEN T SAWEIKIS, Trustee of THE EILEEN T SAWEIKIS DECLARATION OF TRUST DATED 04/04/1993 AND AMENDED 04/30/1999** , and known to me to be an authorized trustee or agent of the trust that executed the Mortgage and acknowledged the Mortgage to be the free and voluntary act and deed of the trust, by authority set forth in the trust documents or, by authority of statute, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Mortgage and in fact executed the Mortgage on behalf of the trust.

By ___Theresa Hunt___ Residing at ___7930 S Fairfield ave Chgo IL 60652___

Notary Public in and for the State of ___ILLINOIS___

My commission expires ___March 28, 2016___

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF ___ILLINOIS___ )
) SS
COUNTY OF ___COOK___ )

THERESA HUNT
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
March 28, 2016

On this day before me, the undersigned Notary Public, personally appeared **GERALD J SAWEIKIS and EILEEN T SAWEIKIS**, to me known to be the individuals described in and who executed the Waiver of Homestead Exemption, and acknowledged that they signed the Waiver of Homestead Exemption as their free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this ___15th___ day of ___August___ , 20 ___12___ .

By ___Theresa Hunt___ Residing at ___7930 S Fairfield ave Chgo IL 60652___

Notary Public in and for the State of ___ILLINOIS___

My commission expires ___March 28, 2016___

LASER PRO Lending, Ver. 5.58.20.001   Copr. Harland Financial Solutions, Inc. 1997, 2012.   All Rights Reserved.   - IL █████████████████



Comptroller of the Currency
Administrator of National Banks

Central District Office
One Financial Place, Suite 2700
440 South LaSalle Street
Chicago, Illinois 60605

July 5, 2011

Andrew Karp
Associate General Counsel
Harris National Association
111 W. Monroe Street
Chicago, Illinois 60603

Re:     Notification of Change in Corporate Title for Harris National Association
         CAIS Control Number: 2011-CE-04-004

Dear Mr. Karp,

The Office of the Comptroller of the Currency ("OCC") has received your documents
concerning the change and amendment to Article First of the above referenced Bank's Articles of
Association. The OCC will amend its records to reflect that effective July 5, 2011 the corporate
title of Harris National Association will be changed to BMO Harris Bank National Association.

Sincerely,

Travis W. Wilbert
Director for District Licensing



Central District Office
One Financial Place, Suite 2700
440 South LaSalle Street
Chicago, Illinois 60605

July 5, 2011

Andrew Karp
Associate General Counsel
Harris National Association
111 W. Monroe Street
Chicago, Illinois 60603

Re:    Applications to convert M&I F.S.B., Las Vegas, Nevada, to a National Bank and to
merge the converted bank as well as M&I Marshall & Ilsley Bank, Milwaukee,
Wisconsin and The Harris Bank National Association, Scottsdale, Arizona into Harris
National Association, Chicago, Illinois, and related notices.
(2011-CE-01-003, 2011-CE-02-005, 2011-CE-11-002 and 2011-CE-12-075)

Dear Mr Karp:

This letter is the official certification of the Comptroller of the Currency (OCC) to merge M&I
Marshall & Ilsley bank, Milwaukee, Wisconsin, FDIC Certificate Number 1020, M&I Bank,
National Association, Las Vegas, Nevada, OCC Charter Number 25013 and The Harris Bank
National Association, Scottsdale, Arizona, OCC Charter Number 24380 with and into Harris
National Association, Chicago, Illinois, OCC Charter Number 14583, effective as of July 5,
2011. The resulting bank title is Harris National Association, OCC Charter Number 14583.

The OCC has also reviewed and found no exceptions to the documents submitted by M&I
F.S.B., Las Vegas, Nevada, to complete the conversion process. The bank is authorized to
convert to a national banking association effective July 5, 2011, with the title "M&I Bank,
National Association", OCC Charter Number 25013.

This letter also constitutes official authorization of the OCC for the converting bank to operate
its present branches, and for Harris National Association to operate the main office and branches
of the target institutions as branches of the resulting bank following the merger. A listing of each
newly authorized branch and its assigned OCC branch number is attached. Branches of a
national bank target are not listed since they are automatically carried over to the resulting bank
and retain their current OCC branch numbers.

Page 2
July 5, 2011
Andrew Karp
Associate General Counsel
Harris National Association

If you have questions, please contact the undersigned at (312) 360-8866 or Senior Licensing Analyst Carolina M. Ledesma at (312) 360-8867.

Sincerely,

Travis W. Wilbert
Director for District Licensing



FFIEC home | Federal Reserve
Board home

Accessibility | Disclaimer |
Privacy Policy

| NIC Home | Institution Search | USBA Search | Top 50 BHCs |
| BHCPR Peer Reports | FAQ | | |

**Institution History for**  BMO HARRIS BANK NATIONAL ASSOCIATION (75633)

6 institution history record(s) found.                    < Previous  **Page** 1 ·        Next >

| Event Date | Historical Event |
|---|---|
| 1882-05-01 | N. W. HARRIS & CO. located at CHICAGO, IL was established as a Non-member Bank. |
| 1907-02-04 | N. W. HARRIS & CO. was **renamed** to HARRIS TRUST AND SAVINGS BANK. |
| 1917-12-13 | HARRIS TRUST AND SAVINGS BANK **changed** from Non-member Bank to State Member Bank. |
| 1984-09-07 | HARRIS TRUST AND SAVINGS BANK **moved** to 111 WEST MONROE CHICAGO, IL. |
| 2005-05-28 | HARRIS TRUST AND SAVINGS BANK was **renamed** to HARRIS NATIONAL ASSOCIATION and **changed** from State Member Bank to National Bank. |
| 2011-07-06 | HARRIS NATIONAL ASSOCIATION was **renamed** to BMO HARRIS BANK NATIONAL ASSOCIATION. |

Page 1 of 1

NIC Home  |  FAQ  |  Help  |  Contact Us